**Bill BLAKE, James Boase and Robert Brown, dba Plains Electroplating and Bumper Supply, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**PLAINS ELECTRO–PLATING AND BUMPER SUPPLY COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. 5–63–68, 5–63–69.

United States District Court
N. D. Texas,
Lubbock Division.

Nov. 13, 1964.

Smith & Baker, by Edward R. Smith, Lubbock, Tex., for plaintiffs.

Melvin M. Diggs, U. S. Atty., and Herbert S. Kendrick, Tax Div., U. S. Dept. of Justice, Fort Worth, Tex., for defendant.

The Court's Findings of Fact and Conclusions of Law in the two combined causes above are hereby recorded for filing therein pursuant to Rule 52, as follows:

DOOLEY, District Judge.

### FINDINGS OF FACT

1

These actions were instituted by a partnership, Plains Electroplating and Bumper Supply, consisting of Bill Blake, James Boase and Robert Brown, and a corporation, Plains Electro Plating and Bumper Supply Company. Inasmuch as these actions involve the operation of a single, continuous business, both entities will hereinafter be referred to as taxpayer.

2

The operation of the taxpayer is straightening and replating automobile bumpers. Upon receiving damaged, unusable automobile bumpers, the taxpayer applies its process to such bumpers for marketing as replacement parts of an automobile. The bumpers processed by the taxpayer are automobile parts and accessories.

**3**

On the average, only about twenty per cent (20%) of the exterior surface of bumpers processed by taxpayer are in a damaged condition, the remaining eighty per cent (80%) being in satisfactory condition. It is not possible to process just the damaged area, so the entire bumper is submitted to taxpayer's process.

**4**

The operation of the taxpayer may be separated into three phases, straightening and sanding, removing or stripping the plate, and replating the bumper itself. In straightening the damaged bumpers, taxpayer uses various hand tools, such as a ball peen hammer, various-sized sledge hammers, pec hammers and a dolly. As an aid to straightening the bumpers, taxpayer uses an acetylene torch to heat the metal so it may be hammered into shape. Also, taxpayer may use one of more than a hundred contour patterns indicating the upper and lower contours of the particular bumper being processed. A swivel or hand press may also be used in the event more pressure on a given spot in the bumper is desired. As soon as the bumper has been hammered into its proper contour and checked on the pattern, the straightening operation has then been completed.

**5**

Badly mangled, twisted or mashed bumpers are not processed by taxpayer because it is uneconomical. Only those bumpers retaining their essential shape and form are processed.

**6**

At no time during the application of taxpayer's process does a bumper lose its identity or cease to be recognizable as the same bumper, and approximately sixty per cent (60%) of the bumpers processed by taxpayer are actually identified by taxpayer through the entire process.

**7**

Upon completion of the straightening process, the bumper is then removed to another room for the sanding operation. Here again the hammer and dolly are used on the bumper. The workman also uses an electric-driven sander, which has attached to it a 50-grit abrasive disc. The power machine is used to grind the bumper to a certain smoothness that cannot be obtained by the hammer and dolly. The "grit" used on the disc will determine the coarseness (or roughness) of the finish on the bumper. The disc turns at 4,500 revolutions per minute at all times during its use in the operation. The completion of this sanding operation concludes the first phase of the taxpayer's process, straightening and sanding, and the bumper is then ready for the removal or stripping of the plate.

**8**

The second phase of taxpayer's process begins with the removal of the bumper to the plating room. There it is suspended in a 230-gallon tank of caustic soda (an alkaline solution) by means of copper hooks. The bumper stays in the tank for varying lengths of time, depending on the size of the bumper itself. This tank is maintained at room temperature. Upon placing the bumper in the tank, there is an electric charge that goes into the bumper itself to remove the plate. Only the chrome is removed from the bumper in this tank and it is accomplished by using only the electric charge and the caustic soda solution. After reducing the bumper to the nickel plate by this process, it is removed from the tank and rinsed with a hose to remove the caustic soda.

**9**

The bumper is then removed to another room where it is treated by power-driven wheels and power-driven belts. The wheels vary in diameter from eight inches up to eighteen inches, are from one to four inches in thickness, and are covered with an aluminum oxide, which is an abrasive grit. Depending on the recess in the particular bumper, it may

be necessary to use a 120, 180 or 220 grit wheel to smooth the bumper. The 120-grit wheel would be considered more coarse than the 220-grit wheel, and normal procedure is to start off with a rougher 120-grit wheel and proceed to a finer 220-grit wheel. There are two additional abrasives used on the wheels in this particular part of the process. One such abrasive is essentially grease placed against the wheel itself to make it faster, and the other is an abrasive compound (called emery cake) placed against the wheel while it is moving and used to facilitate polishing. A polishing belt, also covered with aluminum oxide, may also be used at this particular point in the process. After treating the bumper with the wheel or belt, the nickel and copper plating of the bumper has been removed and the bumper essentially reduced to its basic metal, steel. There is nothing removed from the bumper after this particular process.

### 10

Upon completion of this abrasive process, the bumper is taken to the plating room and placed in the cleansing tank. The bumper is suspended in this tank by means of copper hooks and will remain in the tank up to approximately 90 seconds. This tank contains an electrolytic cleaner which is called Oakite 27, also alkaline in content. The tank is heated by means of a gas heater and the temperature is maintained at approximately 180 degrees to 200 degrees Fahrenheit. Also, an electric charge (an electrolytic process) is utilized in this tank to remove the grease or smut, cleaning compounds, or polishing compounds that may be on the bumper. The bumper is then removed from the tank and scrubbed down with a scrub brush to further remove any grease or dirt that might be on the bumper. At this time, there is no copper, nickel or chrome remaining on the bumper.

### 11

The next step in the operation of the taxpayer is to place the bumper in a rinse tank (containing running clear water) for a matter of a few seconds. Then the bumper is taken to the "pickling tank" which contains an acid salt, M-629 Maytex pickling salts. This pickling tank is used to activate the metal for the plating operation. This treatment removes an oxidation or film which happens to be on the bumper and may be accomplished by placing the bumper in the tank for only a short time. Upon removing the bumper from the "pickling tank," it is submerged for a matter of seconds in another rinse tank containing running clear water. Thereupon, the bumper is carried from this second rinse tank to the first replating material, namely, the copper tank.

### 12

The bumper is suspended by means of copper hooks in the 800-gallon copper tank. This tank contains a solution of copper resulting from the use of copper anodes which are on the side of the tank. The temperature is maintained at 140 degrees Fahrenheit by means of an electric, immersion heater. The electrical charge going into the bumper in this tank varies with the size of the bumper, though the maximum electrical charge is six volts, and the workman placing the bumper in the tank determines how much electric charge shall be given the tank. The bumper will stay in the copper tank from ten to fifteen minutes, again depending on the size of the bumper itself.

### 13

Upon completion of the copper plating, the bumper is removed and taken to another room for what the taxpayer calls "buffing" by a power-driven buff. Here the entire surface of the bumper is brought to a high gloss. The buff is made from canvas or muslin material and is round like a wheel. An abrasive compound, Triple E compound, in the form of a brick weighing a pound and three quarters to two pounds is placed on the wheel. This abrasive brick is taken by hand and placed against the buff wheel and as the buff is turning,

some of the abrasive material rubs off on it. Then, the bumper is brought up to the buff wheel. Upon completion of the "buffing" process, the bumper is rubbed down with lime.

## 14

The bumper then returns to the same cleaning cycle indicated above, where it is rinsed in running clear water, placed in the pickling tank, and rinsed again in clear running water.

## 15

After completion of this second rinsing operation, the bumper is again suspended by hooks in the nickel tank. This nickel tank works on the same principle as the copper tank, inasmuch as it contains a nickel solution and nickel anodes are attached to the side of the tank with an electrolytic charge ranging between 200 amps and 500 amps. The electric charge in the nickel tank is greater than that in the copper tank; the reason for this difference is that the nickel solution and the copper solution have different plating speeds. The bumper remains in this tank from 30 to 45 minutes, depending on the size of the bumper.

## 16

In some instances, upon completion of nickel-plating the bumper, it can be taken directly to the final plating process, the chrome tank. However, approximately 50 per cent of the time additional "buffing" is needed by the bumper. On these occasions, the bumper is returned to the buffing room for treatment with an additional abrasive material, a nickel buffing compound. This process is accomplished by a wheel, turning at 800 revolutions per minute, similar to the one used in the copper buffing operation. Then the bumper is again wiped with lime, returned to the plating room, and rinsed with a hose. It has now been prepared for the final phase of the process, the chrome tank.

## 17

The chrome plating of a bumper is accomplished by placing the bumper by hooks in the chrome tank. The temperature of this tank is maintained at approximately 100 degrees Fahrenheit by an electric, immersion type heater. This tank also receives an electric charge and, though the tank has a capacity up to 3,000 amps, the normal bumper will take an electric charge between 1,500 to 2,000 amps in this plating process. The application of the chrome plating normally takes about 90 seconds. The bumper is then removed and, after rinsing by a hose, the process of the taxpayer is completed.

## 18

The total thickness of the "plate" removed and added to the steel bumper is approximately 5 thousandths of an inch.

## 19

The taxpayer's process is a manufacturing operation.

## 20

Having completed the process, the bumper is then ready to be sent to a customer or placed in the inventory of the taxpayer. The taxpayer maintains an inventory of approximately one hundred finished bumpers with a value of $1,500.00. One method of disposing of the finished bumpers is the so-called "exchange transaction." The taxpayer's average sales price is $20, though prices may range from $19.66 to $108. This price is determined by taking 70 per cent to 80 per cent of the list price for a new bumper. The taxpayer has title to the rebuilt bumpers in the exchange transactions, and these transactions do not involve any bumpers to which title is retained by the customer. This "exchange transaction" may be described as follows: Taxpayer receives notification from a customer (an auto body shop) who desires to purchase a particular model bumper, the bumper is delivered to the customer and an exchange bumper is picked up by the taxpayer. At the end of the month, the customer is sent a statement for the amount of the bumper.

Occasionally, bumpers are sold without picking up an exchange.

21

The exchange transactions are made on both a retail and wholesale basis. In the retail exchange, the customer normally orders one or two bumpers from the taxpayer; the bumpers are delivered to the customer; the exchanges are picked up, and upon payment at the end of the month, the transaction is completed. In the wholesale operation, the customer would normally order from one to twenty-five bumpers. The bumpers would then either be delivered or shipped to the customer, and an attempt would be made to pick up the exchange bumpers from the customer. There are times when the taxpayer receives a greater (or less) quantity of damaged bumpers in an exchange. The difference in a wholesale and a retail exchange is that the wholesale exchange handles a larger volume of business. The taxpayer permits a 25 per cent discount on the list price for a bumper in a retail exchange and in a wholesale exchange, the discount is increased to 43 per cent. If the customer has no bumper to exchange, then the list price is charged for the bumper, or the customer is permitted to substitute a different bumper in the transaction. The retail and wholesale transactions of the taxpayer are about evenly divided, and all of the taxpayer's customers in these exchange transactions are body shops, which in turn sell the bumpers to the public at large.

22

The "exchange transaction" between the taxpayer and a customer is a sale.

23

During January and February 1963, the partnership received income resulting from these exchange transactions in the amount of $7,104.88, and in March 1963 the corporation received income from these exchange transactions in the amount of $1,985.37. The Commissioner of Internal Revenue determined that the taxpayer's operations with respect to these bumpers constituted manufacturing and subjected taxpayer's operations to excise tax liability under the applicable statutes and, accordingly, assessed excise taxes on such transactions in the amounts of $568.39 for the partnership and $158.83 for the corporation. In June 1963, timely claims for refund were filed, were later disallowed by the Commissioner of Internal Revenue, and these suits were subsequently filed.

CONCLUSIONS OF LAW

1

This Court has jurisdiction of the subject matter and the parties herein.

2

The taxpayer's restoration of unserviceable automobile bumpers to serviceable condition by reshaping, grinding, and removing the old chrome, polishing, electroplating and replating with new copper, nickel and chrome constitutes manufacturing within the meaning of Section 4061(b) of the Internal Revenue Code of 1954.

3

The "exchange transactions" of the taxpayer constitute sales within the meaning of Section 4061(b) of the Internal Revenue Code of 1954.

4

The action of the Commissioner of Internal Revenue in assessing excise taxes on such transactions in the amounts of $569.13 and $159.46 against the taxpayer for the first quarter of 1963 was correct and proper, and the taxpayer is not entitled to any refund of manufacturing excise taxes paid to the Commissioner for the first quarter of 1963.

5

Judgment should be entered for the defendant accordingly.